IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DEBORAH HARRISON-KHATANA                :

                                                :

      v.                            :   Civil Action No. DKC 11-3715

                                                  :

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY              :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this disability discrimination case is the motion for summary judgment filed by Defendant Washington Metropolitan Area Transit Authority ("WMATA" or "Defendant"). (ECF No. 57). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be granted in part and denied in part.

## I. Background

### A. Factual Background

Unless otherwise noted, the following facts are uncontroverted. WMATA hired Plaintiff Deborah Harrison-Khatana ("Plaintiff" or "Ms. Harrison-Khatana") in 2002 as a bus operator. (ECF No. 57-1). Sometime in 2007 or 2008, Plaintiff began working as a fare box puller. (ECF No. 57-2, at 2). Fare box pullers retrieve money from the fare boxes of WMATA's Metrobuses. (ECF No. 64-1, at 4).

Plaintiff asserts that she served in the military and was discharged with a permanent disability to her right knee, although she provides no records evidencing her prior military service or medical records indicating a permanent disability in her right knee. During her tenure with WMATA, Plaintiff sustained several on-the-job injuries, for which she sought worker's compensation. For instance, Plaintiff filed a worker's compensation claim on February 10, 2009. (ECF No. 57-3 ¶ 2). Plaintiff states that she injured her left knee in February 2009, "trying to pull out a heavy fare box out of the vault it was heavy, and popping my back, which caused the pain in my leg and my back." (ECF No. 64-2, at 87).

WMATA voluntarily paid Plaintiff compensation from February 11, 2009 to August 14, 2009. (ECF No. 57-3 ¶ 4). WMATA requested that Dr. Louis Levitt ("Dr. Levitt") evaluate Plaintiff in an independent medical examination scheduled for August 4, 2009. (*Id.* ¶ 5). Dr. Levitt produced a written report opining that Plaintiff was at maximum medical improvement and capable of returning to work immediately as a farebox puller. (ECF No. 57-4, at 3). He stated that "[n]o further treatment is justified as it relate[s] to the 2/10/09 accident." (*Id.*). Consequently, WMATA discontinued any further temporary total disability payments to her on August 14, 2009, which Plaintiff contested to the Maryland Worker's Compensation

Commission. (ECF No. 57-3 ¶ 7). On January 14, 2010, the Commission issued an order granting Plaintiff an additional period of total temporary benefits from August 15, 2009 until November 20, 2009, but denying any temporary total disability benefits thereafter. (*Id.* ¶ 8). Plaintiff appealed the decision of the Commission, which was affirmed by a jury in the Circuit Court for Prince George's County. (*Id.*). Plaintiff returned to work full duty, without limitations, on April 7, 2010. (ECF No. 57-15).

Shortly after her return to work, on May 14, 2010, Plaintiff injured her right shoulder in a new worker's compensation accident. (*See* ECF No. 57-10). Plaintiff received temporary total disability payments from May 15, 2010 until July 27, 2010. (*Id.*). Plaintiff states that when she returned to work in July of 2010, she was told not to "kneel" the bus, which involves lowering the bus – either the first step of the bus or the platform, depending on the type of bus. (ECF No. 57-2, at 14). Plaintiff maintains that she had a permanent disability in her right knee, and sustained injuries to her left knee and back, conditions which were exacerbated by Defendant's refusal to allow her to kneel the bus. (ECF No. 64-2, at 70-71).

On August 10, 2010, Plaintiff filed a grievance based on a "safety hazard that prevents [her] from do[ing] [her] job duty safely." (ECF No. 57-12, at 1). Plaintiff asserted in the

grievance that Mr. Washington, her evening supervisor, told maintenance employees on July 29, 2010 that they could no longer kneel the bus in the service lane. (*Id.*). She further contends that she had been kneeling the bus since she became a fare puller in 2007 and was told in a safety class that this was an acceptable practice. Plaintiff asserts that she was previously allowed to kneel the bus when she worked in other divisions of WMATA, and blames Summon Cannon for refusing her the ability to kneel the bus and threatening her suspension and termination if she continued to do so. (ECF No. 64-2, at 91-94).

Jacqueline Smith, the superintendent of transportation at the time, testified during her deposition that she met with Plaintiff regarding her August 2010 grievance. She stated that she did not have authority to grant Plaintiff's request to kneel the bus because Mr. Drew was responsible for bus maintenance. (ECF No. 57-13, at 3). She stated, however, that "we would never allow [any] farebox puller to kneel the bus. It's never been done, to my knowledge." (*Id.*). Summon Cannon testified in his deposition that he denied Plaintiff's August 2010 grievance. He stated:

> Because I did an investigation, along with Mr. Drew, and Mr. Garland from the union and we reviewed the location and we all felt that it wasn't necessary to kneel the bus because of safety hazards and the buses backing up.

(ECF No. 57-14, at 4).   Mr. Cannon testified that he considered whether Plaintiff's request to kneel the bus could be granted, but ultimately determined that it could not:

> Q: Did you make an attempt to see whether or not Ms. Harrison's request could be accommodated?
>
> A: Yes.
>
> Q: And what were the reasons you decided it could not be?  I know you have said safety and you have indicated the backing up of the buses, correct?
>
> A: Correct.
>
> Q: And you also indicated something about the second step being higher than the first step.  What exactly do you mean by that?
>
> A: That with the curb that was at Montgomery division, when you pull the bus into the curb, that first step is lower than the second step and if you had lowered the bus, it would have lowered the first step and had nothing to do with the bus.
>
> . . .
>
> A: The second step is higher than the first step.
>
> Q: And so what conclusions, if any, did you draw from seeing that?
>
> A: That if the second step is higher than the first step, it wasn't necessary to lower the bus for the first step.
>
> Q: Meaning Ms. Khatana still had to make the second higher step?
>
> A: Correct.

Q: And how many steps were there?

A: Three.

(ECF No. 57-14, at 5).

Plaintiff then had a third injury on October 26, 2010, which resulted in another worker's compensation claim; she was "paid compensation for temporary total disability from October 27, 2010 to November 25, 2010." (ECF No. 57-11). Upon her return to WMATA after this third injury, Plaintiff participated in WMATA's light duty program from November 26, 2010 until February 24, 2011, performing clerical and dispatching duties. (ECF No. 57-5). Telores Hill, an employee in WMATA's Return to Work Department, stated in his affidavit that Plaintiff exited the program on February 24, 2011, "as a result of an [independent medical evaluation] opinion in which the doctor opined Plaintiff was then capable of returning to full duty status." (ECF No. 57-5 ¶ 8).

During a court proceeding in 2011, the Manager of Bus Operations at the Four-Mile Run Division, Lucious Rucker, learned that in 2003, Plaintiff had been indicted for filing a false report in an application for federal workers' compensation. (ECF No. 57-6, at 3 & ECF No. 57-7). Plaintiff had entered into a plea agreement with the Government, conceding that she made false statements in written forms to obtain federal workers' compensation. At the time of the events

leading to her indictment, Ms. Harrison-Khatana was employed as a labor custodian at the Southern Maryland Bulk Mailing of the United States Postal Service ("USPS"). (ECF No. 57-8). The statement of facts in connection with the plea agreement stated that as a result of Plaintiff having submitted a false worker's compensation form, "in which she stated that she had not worked during the preceding fifteen (15) month period, defendant Harrison-Khatana falsely obtained $20,203.00 in workers' compensation benefits." (*Id.*).

The parties dispute whether Plaintiff ever disclosed the indictment and plea agreement to WMATA. Defendant maintains that Plaintiff never disclosed this event, in violation of Rule 4.1. of WMATA's Rule and Regulations. Rule 4.1 states:

> Employees while on or off duty are expected to conduct themselves in a manner that will not give cause for arrest, indictment, or in any manner bring disgrace to fellow employees or to the Authority.
>
> a) Employees arrested on or off duty must report the matter in writing or by telephone within a 24 hour period of the arrest to the immediate supervisor.
>
> b) Employees who are summoned to court must provide a copy of the summons to their immediate supervisor.

(ECF No. 57-9). After finding out about the indictment and plea agreement, Mr. Rucker informed his supervisor, Robert Ballard. WMATA terminated Plaintiff on July 13, 2011.

Plaintiff filed a grievance contesting her termination in August 2011. (ECF No. 57-6 at 1). Plaintiff's grievance proceeded through every step of the grievance process, culminating in an arbitration hearing on April 5, 2012. On September 10, 2012, the arbitrator issued a written decision conditionally reinstating Plaintiff. The arbitration decision states that Mr. Ballard ordered Mr. Rucker to conduct an investigation. (*Id.* at 3). Mr. Rucker concluded that Plaintiff did not report her arrest and plea bargain in 2003 and recommended that she be terminated. Mr. Ballard agreed and Plaintiff was terminated. The arbitrator faulted WMATA for failing to investigate whether Plaintiff ever informed her supervisor during the relevant period about her arrest and indictment, as Plaintiff argued that she had. Plaintiff's reinstatement was conditioned on her fitness for duty, "including her ability to perform the physical requirements of her previous position, when and if she reached that level of ability, and any efforts at mitigating any loss she may have sustained." (*Id.* at 6).

Plaintiff rejoined WMATA in March of 2013. (ECF No. 57-2, at 7). By the time she returned to WMATA, there was a restructuring and the fare box puller position was reclassified to maintenance, fleet service (E/S). (*Id.* at 8). Plaintiff testified that the new position encompasses fare box pulling,

and added a few additional responsibilities, such as sweeping the bus and steaming the engine. (*Id.* at 11).

### B.   Procedural History

After filing a charge with the Equal Employment Opportunity Commission ("EEOC") On October 21, 2010, Plaintiff received a right to sue letter on September 28, 2011.[1]  Plaintiff filed a *pro se* complaint on December 23, 2011, naming WMATA and Summon Cannon – a district manager with WMATA – as defendants, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA").  (ECF No. 1).   Mr. Cannon filed a motion to dismiss the complaint, which the court granted by memorandum opinion and order issued on October 31, 2012, finding that Plaintiff's Title VII and ADA claims could not be maintained against the manager in his individual capacity.  (ECF Nos. 14 & 15).

On April 29, 2013, WMATA moved for summary judgment.  (ECF No. 29).   On May 17, 2013, counsel entered an appearance on Plaintiff's behalf (ECF No. 32).   Instead of responding to the motion for summary judgment, Plaintiff filed a motion for leave to amend her complaint, attaching an amended pleading in which

---

[1]  In her EEOC charge, Plaintiff only checked the box for "disability" as the basis for discrimination.  (ECF No. 57-1).

she sought to raise a claim under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*, and a supplemental claim for intentional infliction of emotional distress. (ECF No. 39). The court issued a memorandum opinion and order on August 27, 2013, granting in part and denying in part the motion for leave to file an amended complaint. (ECF No. 43). The court held that amendment would be futile as to the claim for intentional infliction of emotional distress, but allowed amendment as to the Rehabilitation Act claim premised on WMATA's failure to accommodate Plaintiff by refusing to allow her to kneel the bus. An amended complaint was docketed on September 10, 2013. (ECF No. 45).

Defendant moved for summary judgment on July 7, 2014. (ECF No. 57). Plaintiff opposed the motion (ECF No. 64), and Defendant replied (ECF No. 67).

## II. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The moving party bears the burden of showing that there is no genuine dispute as to any material fact. However, no genuine dispute of material fact exists if the nonmoving party

fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex,* 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most

favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III. Analysis

In her amended complaint, Plaintiff asserts that Defendant discriminated against her under the Rehabilitation Act by denying her a reasonable accommodation in refusing to kneel the bus beginning in July 2010 and refusing her light duty request.[2]

---

[2] In her opposition to the motion for summary judgment, Plaintiff withdraws the claim for failure to accommodate based on a denial of light duty. She states: "Plaintiff was not capable of working a regular duty position, however, defendant,

(ECF No. 45 ¶ 6). Although the amended complaint is not entirely clear as to whether she also argues that she was terminated on the basis of disability discrimination, Defendant interprets the amended complaint as also asserting that she was terminated as a result of discrimination. (*See* ECF No. 57, at 2).

Plaintiff's discrimination claims arise under the Rehabilitation Act. The Rehabilitation Act prohibits discrimination against an "otherwise qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a). There are "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Balt. Cnty., Md.*, 515 F.3d 356, 362 (4th Cir. 2008). Plaintiff's claims against WMATA are premised on its alleged failure to accommodate and disparate treatment by termination.

### A.   Failure to Accommodate

To succeed on her failure to accommodate claim, Plaintiff must demonstrate that: (1) she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of the disability; (3) she could perform the

---

in that instance, is correct that WMATA['s] denial of her request [for] accommodation appears justified." (ECF No. 64, at 13).

essential functions of her position with a reasonable accommodation; and (4) the employer refused to provide such accommodations. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citation omitted). "Implicit in the fourth element is the [] requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atlantic Capital Management*, 131 F.App'x 399, 400 (4th Cir. 2005).

As a threshold matter, Defendant contends that Plaintiff cannot establish that she is a "qualified individual with a disability" covered by the Rehabilitation Act because she cannot point to a physical impairment that substantially limited her major life activities. (ECF No. 57, at 12). The parties agree that the relevant time period for purposes of determining disability is July 28, 2010 to October 26, 2010.[3] (*See* ECF No. 57-11). Defendant avers:

> Plaintiff's operative time period of only three months is not of long duration and therefore not substantially limiting. Plaintiff's argument that [a] three month period of difficulty [in] stepping up into WMATA Metrobuses constitutes disability discrimination under the Rehabilitation Act would lead to the unreasonable conclusion that virtually every workers' compensation claim of injury is a viable Rehabilitation Act claim.

---

[3] Plaintiff became temporarily totally disabled on October 27, 2010, when she sustained a third work-related injury.

(ECF No. 57, at 12).   Defendant also contends that Plaintiff "is required as a matter of law to show more [than] just her inability to perform the manual tasks associated with her being a farebox puller. . . . Plaintiff's referencing of just one task that she had difficulty performing – climbing the bus steps – does not meet the requisite standard of proof for a substantial limitation for the major life activity of working."   (*Id.*). Defendant also argues that the record lacks evidence that Plaintiff was unable to work in a broad class of jobs, which Defendant believes is necessary for Plaintiff to prove that she has a qualifying disability.

Plaintiff counters that she is a disabled veteran with a permanent physical impairment to her right knee.   (ECF No. 64, at 7).   She states that "[i]n addition to her permanent disability to her right knee, she sustained injury to her left knee, back and lower back in February 2009."   (*Id.* at 8). Plaintiff avers that from July 28, 2010 until October 26, 2010, "her problem with her legs and back substantially limited her work."   (*Id.* at 11).   Plaintiff contends that she experienced difficulties climbing the steps to the bus and that she "is unable to work in a broad class of jobs.   Moreover, Plaintiff's permanent disability and temporary disability is of long duration and therefore substantially limiting."   (*Id.*).

15

An "individual with a disability," or handicap is defined as one who:

> (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
>
> (ii) has a record of such an impairment; or
>
> (iii) is regarded as having such an impairment.

Rehabilitation Act, 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1)(A)-(C).   To support its contention that Plaintiff is not disabled, Defendant largely relies on case-law that predates the enactment of the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008).[4]   "[T]he continued validity of such cases is suspect." *Barrett v. Bio-Medical Applications of Maryland, Inc.*, Civ. Action No. ELH-11-2835, 2013 WL 1183363, at *9 (D.Md. Mar. 19, 2013).   Both parties fail to address the import of the ADAAA passed in 2008 – becoming effective on January 1, 2009 – which applies here.[5]   *See Johnson v. Baltimore City Police Dept.*, Civ. Action No. ELH-12-2519,

---

[4] Defendant cites in its motion for summary judgment *Lyons v. Shinseki*, 454 F.App'x 181 (4th Cir. 2011) and *Hailey v. Donahoe*, No. 6:11-cv-00022, 2012 WL 4458451 (W.D.Va. July 30, 2012).   Both of those cases, however, applied the law in place *prior to* the amendments, noting that the amendments do not apply retroactively to conduct that occurred prior to the enactment on January 1, 2009.

[5] The applicable time period when Plaintiff asserts she was denied a reasonable accommodation begins in July 2010, post-dating the amendments to the ADA.

16

2014 WL 1281602, at *14 (D.Md. Mar. 27, 2014) ("Although plaintiff was hired in 1999 and suffered injuries in 2005 and 2008, [] the incidents on which her allegations of discrimination are based occurred in 2010 and 2011. [] Therefore, this case is governed by the ADAAA."); *Lapier v. Prince George's County, Md.*, Civ. Action No. 10-CV-2851 AW, 2013 WL 497971, at *5 (D.Md. Feb. 7, 2013) ("Courts use the same standards to analyze a claim for discrimination under the Rehabilitation Act as they do a claim for discrimination under the ADAAA."); ADAAA, Pub. L. 110-325, § 7(1), 122 Stat. 3553, 3558 (amending the Rehabilitation Act to incorporate the ADAAA's definition of disability).  As explained in *Bennett v. Kaiser Permanente*, 931 F.Supp.2d 697, 707 (D.Md. 2013):

> The obligation to apply the ADA rather than the ADAAA is consequential.  Before [C]ongress enacted the ADAAA, courts relied on a pair of Supreme Court cases that created "a demanding standard for qualifying as disabled." [] (*citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002), *superseded by statute*, ADAAA, Pub.L.No. 110-325, 122 Stat. 3553; *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), *superseded by statute*, ADAAA, Pub. L. No. 110-325, 122 Stat. 3553).

"Congress enacted the ADAAA with the express purpose of legislatively overruling the Supreme Court's decisions in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), as well as its predecessor, *Sutton v. United AIR Lines*,

Inc., 527 U.S. 471 (1999), and their progeny." *Johnson*, 2014 WL 1281602, at *14.   Defendant relies on *Toyota* and *Sutton*, however, in framing its arguments, failing to acknowledge that amendments to the ADA "liberaliz[ed] the standard used to establish disability under the ADA." *Wilson v. Board of Educ. of Prince George's County*, No. 12-cv-2092-AW, 2013 WL 3146935, at *6 (D.Md. June 18, 2013).   Indeed, "the ADA, as amended by the ADAAA, requires that the "'definition of disability in [the ADA] shall be construed in favor of broad coverage.'" *Barrett*, 2013 WL 1183363, at *9 (*quoting* 42 U.S.C. § 12102(4)(A)).   In fact, the United States Court of Appeals for the Fourth Circuit has recently concluded that although a district court's holding would have been "entirely reasonable" under *Toyota* and its progeny, the alleged impairment at issue fell "comfortably within the [ADAAA's] expanded definition of disability." *Summers v. Altarum Institute, Corp.*, 740 F.3d 325, 330-333 (4th Cir. 2014).

As stated, Plaintiff asserts that she has physical impairments which substantially limit one or more of her major life activities.   The ADAAA identifies the following "major life activities": "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, *walking*, standing, lifting, bending, speaking, breathing, learning, reading, concentration, thinking, communicating, and *working*."   42 U.S.C. § 12102(2)

(emphases added); *Pisani v. Baltimore City Police*, No. WDQ-12-1654, 2013 WL 4176956, at *7 (D.Md. Aug. 14, 2013). Plaintiff asserts that during the relevant period, she had physical impairments to her knees and back which substantially limited her in walking and working, both of which are considered major life activities. (ECF No. 64, at 5). Plaintiff provides no evidence from the record to show how her alleged disability in the right knee or injuries to her left knee and back substantially limit her *walking* abilities. *Johnson v. United States*, 861 F.Supp.2d 629, 634-35 (D.Md. 2012) (noting that it is the obligation of the parties, not the Court, to locate and cite to the appropriate portions of the record that support the parties' arguments on summary judgment). Merely stating in her opposition to the motion for summary judgment that Plaintiff's disability substantially limited her walking is insufficient to show a qualifying disability. *Sanchez v. Vilsack*, 695 F.3d 1174, 1178 (10th Cir. 2012) ("[I]t is not sufficient for a plaintiff to identify an impairment and leave the court to infer that it results in substantial limitations to a major life activity."). Plaintiff also asserts that she was limited in working and cites to portions of the record that she believes support this contention. Defendant cites *Sutton* for the proposition that "[w]hen work is the major life activity under consideration, the statutory phrase 'substantially limits'

requires a plaintiff, at a minimum, to allege he or she is unable to work in a broad class of jobs." (ECF No. 57, at 11). As noted, however, that case was one that Congress specifically sought to overrule when enacting the ADAAA.

The *pre-ADAAA* EEOC regulations support Defendant's position:

> *The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skill and abilities.* The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i) (2010) (emphasis added). The problem for Defendant, however, is that Congress rejected these EEOC regulations that defined the term "substantially limits" as "significantly restricted," finding that this expressed too high a standard for determining disability under the ADA. ADA Amendments Act of 2008, Pub.L. No. 110-325, § 2(a)(8), 122 Stat. 3553; 76 Fed.Reg. 16999 (Mar. 25, 2011). Following the amendment, 29 C.F.R. § 1630.2(j)(1)(i)-(ii) (2012) states, in relevant part:

> (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. *"Substantially limits" is not meant to be a demanding standard.*

>    (ii) An impairment is a disability within
>    the meaning of this section if it
>    substantially limits the ability of an
>    individual to perform a major life activity
>    as compared to most people in the general
>    population. *An impairment need not prevent,*
>    *or significantly or severely restrict, the*
>    *individual from performing a major life*
>    *activity in order to be considered*
>    *substantially limiting.*

(emphases added). The applicable version of 29 C.F.R. § 1630.2

does *not* contain language providing that "substantially limits"

requires a restriction in the ability to perform a "class of

jobs or a broad range of jobs";[6] thus, Plaintiff's failure to

prove as much is not detrimental to her claim. *See, e.g.,*

*Boitnott v. Corning Inc.*, 669 F.3d 172, 175 n.4 (4th Cir. 2012);

*Palmerini v. Fidelity Brokerage Servs. LLC*, Civ. No. 12-cv-505-

JD, 2014 WL 3401826, at *5 (D.N.H. July 9, 2014) ("Fidelity

contends in support of summary judgment that Palmerini cannot

show that he is substantially limited in the major life activity

---

[6] Moreover, Section 1630(2)(j)(4)(i) states:

>    in determining whether an individual is
>    substantially limited in a major life
>    activity, it may be useful in appropriate
>    cases to consider, as compared to most
>    people in the general population, the
>    condition under which the individual
>    performs the major life activity; the manner
>    in which the individual performs the major
>    life activity; and/or the duration of time
>    it takes the individual to perform the major
>    life activity, or for which the individual
>    can perform the major life activity.

he claims, working.   Citing the version of § 1630.2(j) prior to amendment following the ADAAA, Fidelity argues that Palmerini cannot show that his depression or PTSD significantly restricted his ability to do either a class of jobs or a broad range of jobs.   Because Fidelity relies on outdated authority, however, that argument is unpersuasive.").

Congress instructed courts "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and . . . that the question of whether an individual's impairment is a disability under the ADA should not demand excessive analysis."   ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(5), 122 Stat. 3553.   An individualized assessment is still required to determine "whether an impairment substantially limits a major life activity," however.   29 C.F.R. § 1630.2(j)(1)(iv).   Although the term "'[s]ubstantially limits' is not meant to be a demanding standard," the regulations state that "not every impairment will constitute a disability."   *Id.* § 1630.2(j)(1)(ii).

Plaintiff gave the following testimony during her deposition with respect to the impairment in her right knee:

> Q: Tell me what happened that *caused you to be disabled in your right knee.*
>
> A: I was in the military, basic training, I was jumping a hurdle and I hurt my knee.

Q: What happened to your knee?

A: *Caused swelling, messed up some tissue, it was popping and it put a strain on the knee.*

Q: [] [D]id you stay in the military after that?

A: Yes, I did.  I did six years and then [] *once I went through the steps, they made me a disabled vet.*

Q: What does that encompass, them labeling you a disabled vet, what do they have to do to come to that conclusion?

A: You get a rating, they do an evaluation and then they do a rating of what your condition is so you can receive payments every month.

Q: Is that considered a permanent disability?

A: Yes, it is.

(ECF No. 64-2, at 86) (emphases added).  She stated that the Department of Veterans Affairs determined that her right knee was disabled, (ECF No. 64-1, at 9), although other than her deposition testimony, she provides no documentation to substantiate her alleged permanent disability in the right knee. Plaintiff also appears to rely on injuries to her left knee and back – arising from the February 2009 injury – as impairments that substantially limited her major life activity of working. Plaintiff stated that she receives shots in both knees in the form of steroids and also receives a "gel that every month [she

23

has] to take." (ECF No. 64-2, at 29).    When asked during her deposition how her alleged disabilities "kept her from doing [] activities," Plaintiff responded: "[j]ust my knees and my back and my job."  (*Id.*).    When defense counsel further pressed Plaintiff, she stated:

> A.  Well, first of all, based on that question, I had to step up on the bus and the platform, with the step of the bus – because you know you have a different bus. The 22 series buses[] are higher, the steps [are] higher from the platform and at that time we had money in the fare box that made the fare box heavy for me to lift and take back to the vault and *stepping up, it was too high, because of putting pressure on my leg and my knee and to step back down*.  It was putting a strain on my back and my knee, which gave me a bulging disk.
>
> . . .
>
> Q: [] I just want you to tell me everything about how you say [the impairments] affected your activities?
>
> A: It was hard to step up the highest bus, the highest steps and the step down, and to lift up that fare box because it had more money in it, it was heavy, and to put it in the vault.  *It was causing me more pain and damage to my knee and my back.*

(*Id.* at 30-31) (emphases added).  Defendant points to aspects of Plaintiff's testimony in which she states that other than experiencing difficulty walking up the stairs in the bus, she was able to perform other aspects of her job; Defendant believes that this testimony confirms that Ms. Harrison-Khatana was not

substantially limited in working.  (*Id.* at 67).  The crux of Plaintiff's failure to accommodate claim, however, is that she had a disability to her right knee and sustained injuries to her left knee by July 2010, she needed an accommodation in order fully to perform her functions as a fare box puller, that kneeling the bus would have accommodated her alleged disability, and indeed, that she was previously allowed to kneel the bus when she served as a fare box puller, but abruptly was denied this accommodation in July 2010.

In the reply brief, Defendant argues that Plaintiff's "prior right knee injury is irrelevant to this . . . Plaintiff's relevant medical history and short periods of temporary disabilities in this litigation arises out of a string of three workers' compensation claims that occurred in the period starting February 2009, and ending in October 2010." (ECF No. 67, at 2).  Defendant's argument is unpersuasive.  Plaintiff's history of injuries or alleged permanent disability to her right knee provides evidence as to whether these purported impairments substantially limited her in a major life activity.  *See Moore v. Marriott Intern., Inc.*, No. CV-12-00770-PHX-BSB, 2014 WL 5581046, at *7 (D.Ariz. Oct. 31, 2014) ("The record includes evidence that Plaintiff has a history of seizures and that she is substantially limited in several major life activities during a seizure.").  Defendant next contends:

> Plaintiff has no record of any impairment
> and WMATA never regarded her as [having] any
> such impairment. WMATA often sends its
> employees who have worker's compensation
> injuries for independent medical
> examinations, and Plaintiff was seen in both
> her 2009 and 2010 claims that pre-dated this
> three-month period of claimed impairment.
> Dr. Louis Levitt saw Plaintiff for both
> claim[s] and opined whether or not she was
> capable of returning to work at her job
> duties. . . . Dr. Levitt in his report dated
> September 25, 2012, stated, "[o]n 5/15/10,
> she overexerted herself . . . and claimed an
> injury to her lower back and right shoulder
> . . . I saw her on 6/29/10 for an
> independent assessment. At that time she
> had little clinical complaint." . . . Dr.
> Levitt stated that with respect to her work
> capacity, there was nothing related to her
> May 14, 2010 injury that wo[uld] interfere
> with her capabilities to "work at any job.
> She can handle work as fare box collector."

(ECF No. 67, at 6; *see also* ECF No. 67-1).

Whether WMATA regarded her as having an impairment is immaterial, however; Plaintiff provides deposition testimony that she had an actual disability of which Defendant was aware and failed to accommodate her. *Dones v. Donahoe*, 987 F.Supp.2d 659, 670 (D.Md. 2013) ("It appears that Plaintiff's supervisors may have confused the Department of Labor's workers' compensation programs with the requirements of the Rehabilitation Act."). Viewing the evidence in the light most favorable to Plaintiff, and construing that evidence in favor of expansive coverage as required by the ADAAA, Plaintiff has raised a genuine dispute regarding whether her knee and back

impairment(s) substantially limited a major life activity of working. *See Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) ("[W]hether [an] impairment substantially limits a major life activity is ordinarily a question of fact for the jury.").

Defendant also intimates that Plaintiff never informed WMATA that she had a disability for which she was requesting an accommodation. Jacqueline Smith, the transit superintendent during the relevant period, testified in her deposition:

> Q: Did Ms. Harrison-Khatana detail the health reasons that she had [] that precipitated her request to have the bus lowered?
>
> A: No, she did not.
>
> Q: Okay. And you had no idea why, healthwise, [] why it would affect her health to have the bus lowered; is that correct?
> . . .
>
> A: I had no knowledge of what injury or what [] her previous workers' comp condition was, what she was experiencing at that time. *She just said that she had a previous injury that prevented, that she wanted to kneel the bus.*
>
> Q: So during your meeting with her, did you inquire what her health condition was that precipitated the request?
>
> A: No, I didn't.
>
> Q: And why not?

> A: Why not?  Because that request was not
> going to be granted.  []  [M]y position is
> if her workers' comp was preventing her from
> performing her duty, then she needed to go
> back to workers' comp and discuss her injury
> with them and they would make a
> determination whether she could continue to
> work or she goes back out with workers'
> comp.  And that was my position.

(ECF No. 64-5, at 3) (emphasis added).

There is a genuine dispute regarding WMATA's knowledge of Plaintiff's alleged disabilities and the need for an accommodation, as the record contains conflicting testimony. Plaintiff's deposition testimony somewhat suggests – albeit obliquely – that she informed WMATA that she needed the bus lowered in order to perform her job due to her disabilities. She stated that she spoke with Mr. Washington and his supervisor, Mr. Drew:

> Q: Now, when you spoke with Mr. Washington,
> did you inform him in any way how lowering
> the bus affected your health?
>
> A: Yes, I did.
>
> Q: And what did you tell him?
>
> A: I told him it was putting a strain on my
> back and my knees and I couldn't do my job
> and that is the reason why I needed to talk
> to Mr. Drew.
>
> Q: And what did Mr. Washington tell you?
>
> A: He told me that I couldn't kneel that bus
> and if I kneeled it again, which he said
> again, that I would get [written] up or
> suspen[ded] or sent home.

(ECF No. 64-2, at 106).   Plaintiff then met with Mr. Drew and
Ms. Jackie Smith, Mr. Drew's supervisor.   In an earlier
deposition, Plaintiff gave the following testimony:[7]

> Q: When you claim, in your charge of
> discrimination, that you were not given
> reasonable accommodation, did you ever make
> a formal request for a reasonable
> accommodation, for any accommodation based
> on your disability?
>
> A: I don't mean to laugh, but you must be
> speaking about them kneeling the bus?
>
> Q: If that's what you're talking about.
>
> A: Yes, I did.  As a matter of fact, I even
> [] went and talked to Ms. Smith, she's the
> superintendent for Montgomery. []
>
> Q: Jackie Smith?
>
> A: Jackie Smith, Mr. Drew, Mr. Washington.
> Because first it started from Mr.
> Washington, he told me no.  Then I went to
> Mr. Drew.
>
> Q: No.  I'm asking about a request.  I don't
> know what being told no means.  But who did
> you request and what did you say?
>
> A: These are individuals that told me no.
> The supervisors told me no, that I could not
> kneel the bus in the fare lane anymore.
>
>          . . .
>
> A: *I was told [previously that] I can kneel
> the bus in the fare lane because of my
> condition.*  And that's what I [have] been
> doing through all of that --

---

[7] Plaintiff was deposed when she was *pro se*, and then again
when she became represented and was given leave to amend her
complaint.

Q: Who told you that?

A: The – let's see, what doctor was that?  I
mean, [you all] have me see so many doctors
I don't know their names.  Told me to kneel
the bus, and *I've been kneeling the bus in
every division that I was working*. . . .  I
was kneeling the bus all the time.

(ECF No. 64-1, at 19-20) (emphases added).[8]  Moreover, Mr. Cannon
stated that he was aware that "[Plaintiff] had some issues that
she couldn't step up on the step."  (ECF No. 57-14, at 4).

Drawing all inferences in favor of Plaintiff, her testimony
suggests that when she worked in other divisions of WMATA, she
was allowed to kneel the bus as an accommodation for her knee
injuries.  Her deposition testimony reflects that she was denied
the ability to kneel the bus only when she came under the
supervision of Summon Cannon and that during the applicable time
frame of July to October 2010, WMATA may have been aware of her
purported disability but refused to find an appropriate
accommodation.[9]

---

[8] Plaintiff stated that she did not recall completing a form
to request a reasonable accommodation.  She stated: "[The form]
must be something new.  But I had my disability prior before in
my record.  Now, what they did with my records, I don't know."
(ECF No. 64-1, at 20).

[9] During her deposition, Plaintiff testified that when she
worked in another division of WMATA, a ramp was either made or
bought for her "[b]ecause the bus was high."  (ECF No. 64-2, at
57).  Plaintiff gave the following testimony:

Although Plaintiff's testimony is not definitive on whether she explicitly informed WMATA of her alleged disabilities and the need for an accommodation, viewing the evidence in the light most favorable to her, there is a genuine dispute of material fact regarding whether Defendant had notice of her alleged disabilities.   Moreover, the testimony from Jacqueline Smith that even if Plaintiff had injuries which required her to kneel she would have sent her to file another worker's compensation claim reflects a misguided understanding of the requirements of the Rehabilitation Act.   Under the Rehabilitation Act, if WMATA knew that Plaintiff was disabled and required an accommodation, it was the parties' responsibility to engage in the interactive process to determine an appropriate accommodation, *not* send Plaintiff to file another worker's compensation claim as Ms. Smith indicates.   *See, e.g., Dones*, 987 F.Supp.2d at 670 ("The fact that Plaintiff no longer had a viable worker's compensation claim does not mean that he is no longer a disabled individual eligible for a reasonable accommodation.").   Similarly, the fact

---

> Q: So you were provided a ramp to use instead of getting on bus.   This was a yellow plastic ramp, correct?
>
> A: The ramp was for me to get on the bus – because they didn't have a ramp – to kneel the bus down, they didn't have [anything] to kneel it down because it still would have been high – they didn't have a platform.

(*Id.* at 58).

that Dr. Levitt determined that Plaintiff may return to work
after her worker's compensation injury does not invalidate
Plaintiff's claim that she had a disability for which she needed
a reasonable accommodation to perform her job.[10]

In its memoranda, Defendant suggests that it had a
legitimate non-discriminatory reason for preventing Plaintiff
from kneeling the bus. Again, Defendant misconstrues the
requirements to prove a failure to accommodate claim, treating
it the same as a wrongful discharge claim to which the *McDonnell
Douglas* framework applies absent direct evidence of
discrimination. The employer need not have "provided the
specific accommodation requested . . ., or even . . . provide[d]
the best accommodation, so long as the accommodation . . . is
reasonable." *Reyazuddin v. Montgomery County, Md.*, 7 F.Supp.3d
526, 549 (D.Md. 2014). Here, even if kneeling the bus would
have posed an undue hardship on Defendant – which WMATA has *not*
argued – it still would have been obligated to provide a
reasonable accommodation for Plaintiff provided she had a
qualifying disability, regarding which there is a genuine
dispute for the reasons explained above. In any event, although

---

[10] Defendant also argues in its motion for summary judgment
that "Plaintiff must prove that [] WMATA's failure to [] allow
her to knee[l] the bus [] was solely as a result of her alleged
disability to her knees and back." (ECF No. 57, at 13).
Defendant is mistaken. Causation is not an element of a *prima
facie* failure to accommodate claim.

Defendant maintains that kneeling the bus in the service lane presented safety concerns, there is conflicting testimony on the record regarding this point too.  Indeed, Plaintiff testified during her deposition that it was part of her job responsibilities to report whether the kneeling function of the bus worked properly and to report any deficiencies to her supervisor.  She stated:

> A: Once I get the bus, and kneeling bus is not working or the lift is not working, then I go to the supervisor.
>
> Q: Who determines whether it is working or not?
>
> A: Maintenance will, they [have] to make sure it works before they put it on the street, they got to have the kneeling and the lift working before they take it out on the street.
>
> Q: Where do they do that testing of the lift?
>
> A: [] [I]n the service lane.
>
> . . .
>
> Q: Is this the same place where Mr. Washington, in your complaint, [told] you not to lower the bus?
>
> A: Correct.

(ECF No. 64-2, at 101).  Plaintiff further testified that in all other divisions of WMATA, she was permitted to kneel the bus in the service lane due to her knee injuries.  Plaintiff further stated that she had been kneeling the bus for "a while, since

[she] [was] at Montgomery and before then when [she] came back to Montgomery." (ECF No. 64-2, at 91).

Based on the foregoing, at this stage of the proceedings, with the evidence currently provided, there is a genuine dispute of material fact as to whether Plaintiff had an impairment that substantially limited her major life activities and whether Defendant denied her a reasonable accommodation. Thus, Defendant's motion for summary judgment will be denied as to the failure to accommodate claim.

### B. Termination

Defendant interprets Plaintiff's amended complaint as also asserting a wrongful discharge claim on the basis of disability. In the amended complaint, Plaintiff is clear that she alleges discrimination by WMATA in failing to accommodate her disability; the amended complaint is far *less* clear, however, about any additional bases for discrimination. Plaintiff asserts that WMATA terminated her on July 13, 2011. The only other assertion in the amended complaint that obliquely suggests a wrongful discharge claim is the contention that "WMATA's management has engaged in a collusive and prohibited personnel practice which also constituted disability discrimination *and*

*disparate treatment* of the Plaintiff."[11]   (ECF No. 45 ¶ 16) (emphasis added).

Disability discrimination claims under the Rehabilitation Act are evaluated under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), "pretext" framework.  *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006).  Under the burden-shifting scheme, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  To establish a *prima facie* case of disability discrimination under the Rehabilitation Act, a plaintiff must show that: (1) she is disabled; (2) she was otherwise qualified for the position; and (3) she suffered an adverse employment action solely on the basis of the disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).  If the plaintiff is successful in establishing a *prima facie* case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the action.  *Laber*, 438 F.3d at 432.  If the defendant provides evidence of a nondiscriminatory reason for its action, the

---

[11] Plaintiff did not assert termination in her October 21, 2010 EEOC charge (ECF No. 57-1), thus in its initial motion for summary judgment (filed before Plaintiff amended her complaint), Defendant argued that she failed to exhaust administratively. Plaintiff raised claims under the ADA and Title VII in her initial complaint, however. Unlike the ADA, the Rehabilitation Act has no administrative exhaustion requirement. *See Raiford v. Maryland Dept. of Juvenile Services*, Civ. Action No. DKC 12-3795, 2014 WL 4269076, at *7 n.7 (D.Md. Aug. 28, 2014).

plaintiff, who bears the ultimate burden of persuasion, must
show by a preponderance of the evidence that the proffered
reason was a pretext for discrimination.  *Id.*

Defendant argues that Plaintiff fails to prove a *prima
facie* case of discrimination because she cannot show that she
has a qualifying disability.  As discussed above, Plaintiff has
raised a genuine dispute of material fact on this point.
Although Defendant does not provide much analysis for its next
argument, it asserts that Plaintiff has not shown that the
discrimination occurred solely on the basis of her disability.
(ECF No. 57, at 13).[12]  In response, Plaintiff asserts in her
opposition: "Plaintiff can show that [] WMATA's failure to
follow their own procedures and allow her to kneel the bus, []
as well as her later termination, were solely as a result of her
alleged disability to her knees and back."  (ECF No. 64, at 9).
Plaintiff points to testimony from Mr. Cannon, which she asserts

_____

[12] Curiously, in its reply brief, WMATA discusses causation
in the context of a retaliation claim.  (*See* ECF No. 67, at 8).
Plaintiff has not asserted in the amended complaint that she was
terminated in retaliation for her filing the EEOC complaint,
however.  Nowhere does retaliation appear as a cause of action
in her amended complaint, nor does she make any arguments about
retaliation in the opposition to the motion for summary
judgment.  In her deposition, Plaintiff stated that she believed
WMATA terminated her in retaliation for filing a grievance
against Defendant in August 2010 for not allowing her to kneel
the bus.  (ECF No. 64-2, at 84).  Because Plaintiff did not
assert a retaliation claim in her amended complaint, however,
the retaliation claim will not be considered.  In any event,
aside from her conclusory averments, Plaintiff has not
established that WMATA retaliated against her.

"as a matter of law, precludes any finding that there is [] not a causal link between her impairments and WMATA's actions, based solely on her impairments." (*Id.*).

The testimony to which Plaintiff refers, however, has nothing to do with her termination in June 2011; instead, it relates to Plaintiff's failure to accommodate claim and whether Mr. Cannon believed WMATA was obligated to lower the lift for its employees. (*Id.* at 8-9). Plaintiff argues that her "ability to prove a causal relationship requires that this Court deny WMATA's motion for summary judgment," but Plaintiff has not supplied any evidence from the record to show that WMATA terminated her based solely on her disability. The only other argument in Plaintiff's opposition regarding causation is that "Defendant's denial of Plaintiff's request [to] kneel the bus without any interactive discussion regarding accommodation, followed by Plaintiff's subsequent termination following having to discontinue kneeling the bus could easily support a reasonable inference that the cause of Plaintiff's termination was discrimination." (ECF No. 64, at 14). Plaintiff's self-serving beliefs are not sufficient to defeat a motion for summary judgment, however. As Defendant points out, Plaintiff was terminated in June 2011, months after she alleges she was denied a reasonable accommodation in July 2010.

In any event, even assuming Plaintiff has established a
*prima facie* case, Defendant has proffered a legitimate non-
discriminatory reason for her termination.  The Rehabilitation
Act is not violated if an employee is discharged because of her
misconduct, "even if the misconduct is related to a disability."
*Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir.
1999).  Further, "it makes no difference if the employee was in
fact guilty of misconduct."  *Pence v. Tenneco Auto Operating
Co., Inc.*, 169 F.App'x 808, 811 (4th Cir. 2006).  Rather, if the
employer "honestly believe[s] that the employee [] engaged in
misconduct, then the employer has not discriminated on the basis
of disability."  *Id.*  Here, Defendant points to Rule 4.1 of
WMATA's Rules and Regulations, which requires employees to
report arrest within twenty-four (24) hours and to provide a
copy of the summons to their immediate supervisor if they are
summoned to court.  (ECF No. 57-9, at 2).  Defendant asserts
that Plaintiff did not report to WMATA her arrest, indictment,
or guilty plea, which prompted her termination.  Plaintiff filed
a grievance, culminating in an arbitration decision
conditionally reinstating her.  Plaintiff maintains that she
notified her supervisor at the time, Mr. Ramey, "about the
situation with the post office.  He told me as long as it didn't
have anything to do with WMATA, which is Metro, then I should
not have to worry about it."  (ECF No. 64-2, at 84).  The

38

arbitrator found that WMATA did not have any records to support its contention that Plaintiff failed to report her indictment. (ECF No. 57-6). The arbitrator noted that WMATA "made no effort, apparently, to ascertain who might have been the Grievant's supervisor in 2003, nor did [it] investigate whether the general supervisor from that time, Sherman Ramey, was still employed by the Authority in order to check on the Grievant's claim that she notified Mr. Ramey after her arrest in 2003." (*Id.* at 6). Consequently, the arbitrator conditionally reinstated Plaintiff and she reported back to work in March 2013. Although the arbitrator ultimately found in Plaintiff's favor in her labor dispute against WMATA, Plaintiff has not provided any evidence that WMATA's stated reason for terminating her was pretextual.

Accordingly, as to Plaintiff's discriminatory discharge claim, summary judgment in Defendant's favor is appropriate.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant will be granted in part and denied in part. A separate order will follow.

/s/

_____
DEBORAH K. CHASANOW
United States District Judge
